# UNITED STATES DISTRICT COURT

for the

Eastern District of California

In the Matter of the Search of )
)
THE CELLULAR TELEPHONE ASSIGNED )
CALL NUMBER (209) 361-1453 )
)
)

Case No. 2:20-sw-0904 DB

**FILED**
Oct 05, 2020
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ District of ___New Jersey___, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1) | Distribution of a Controlled Substance |
| 21 U.S.C. Section 846 | Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☒ Continued on the attached sheet.
☒ Delayed notice __30__ days (give exact ending date if more than 30 _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ James Bonanno (signed electronically)
*Applicant's signature*

James Bonanno, Special Agent, DEA
*Printed name and title*

Sworn to me and signed by telephone.

Date: 10/05/2020

City and state: Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

McGREGOR W. SCOTT
United States Attorney
DAVID W. SPENCER
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of:<br><br>THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER **(209) 361-1453** | CASE NO.<br><br>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO OBTAIN PRECISE LOCATION DATA FROM A CELLULAR TELEPHONE<br><br>**UNDER SEAL** |
|---|---|

I, James Bonanno, being first duly sworn, hereby depose and state as follows:

**I.     INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (209) 361-1453 (the "Target Cell Phone"), whose service provider is Sprint, a wireless telephone service provider headquartered at 6360 Sprint Parkway, Overland Park, Kansas. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127.  The requested

AFFIDAVIT                                                           1

1  warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3. I am a Special Agent with the Drug Enforcement Administration ("DEA"), Sacramento District Office, and have been so employed since 2018. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing criminal laws and duly authorized by the Attorney General to request a search warrant. I am responsible for conducting investigations into narcotics traffickers and assisting in their apprehension. These investigations are conducted both in an undercover and overt capacity and involve electronic surveillance, cellphone-location evidence, confidential informants, and the execution of search and arrest warrants. Upon being hired by DEA, I completed a four-month DEA Basic Agent School at Quantico, Virginia. After completing DEA Basic Agent School, I reported to my current assignment at the Sacramento District Office, Enforcement Group 2.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 and 841 (conspiracy to distribute, manufacture, and possess with intent to distribute fentanyl and heroin) have been committed, are being committed, and will be committed by Alberto SALGADO and other known and unknown co-conspirators. There is also probable cause to believe that Alberto SALGADO's drug Source of Supply is the user of the Target Cell Phone, described in Attachment A, and the location information for these phones described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is in the Eastern District of California a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

AFFIDAVIT     2

## II.     PROBABLE CAUSE

7. As discussed in further detail below, DEA agents have been investigating the drug trafficking activities of Alberto SALGADO. Through the investigation, agents have conducted controlled buys of: (1) 100 grams of heroin from SALGADO on August 8, 2019; (2) 176 grams of heroin and 2 fentanyl pills from SALGADO on September 5, 2019; (3) 86 grams of counterfeit prescription pills containing fentanyl from SALGADO on October 21, 2019; (4) 119 grams of counterfeit prescription pills containing fentanyl from SALGADO on June 3, 2020; and (5) 104 gross grams of counterfeit prescription pills suspected to contain fentanyl from SALGADO on September 17, 2020. Agents identified phone number (916) 212-5752 as a phone that is being used by SALGADO and on September 15, 2020, Magistrate Judge Carolyn K. Delaney authorized a warrant to collect precise location data on this phone for a period of thirty days. During these time periods, precise location information showed multiple locations that SALGADO used as suspected illicit drug stash locations.

8. Following the September 17, 2020, controlled buy, agents identified the Target Cell Phone as a phone number likely used by SALGADO's suspected Source of Supply's ("SOS"), Martin CERVANTES Vasquez, as described below. This affidavit seeks to authorize the collection of precise location information for a period of thirty days on the Target Cell Phone.

### A.     Background of Investigation

9. Beginning in May 2019, I began receiving information from a Confidential Source (the "CS") about the drug-trafficking activities of Alberto SALGADO. The CS provided this information solely in hopes of receiving monetary compensation. The CS has no pending criminal cases but does have a prior criminal history, which includes felony convictions for theft and firearms offenses. The CS has provided other federal law enforcement officers with assistance in the past including but not limited to providing intelligence, making controlled purchases of narcotics, firearms, introducing undercover agents to purchase narcotics. The CS's information has previously been utilized in state and federal search warrant affidavits leading to the seizure of large quantities of narcotics and firearms and the successful prosecution of individuals for federal criminal offenses. I have never found the CS to be false or misleading, and the CS's descriptions of drugs and drug dealing have been entirely consistent with my own training and experience in this area. For these reasons, I consider the CS reliable. During this

AFFIDAVIT                                            3

investigation, agents monitored and audio recorded the CS place numerous phone calls to SALGADO and during these calls, SALGADO talked to the CS about drug-related topics and information which the CS previously told me about. Under the supervision and direction of DEA agents, the CS arranged and conducted multiple controlled purchases of heroin and counterfeit oxycodone pills containing fentanyl from SALGADO

10. The CS told me that Alberto SALGADO was a kilogram-level heroin and cocaine trafficker, in addition to being an unlawful firearms distributor. The CS provided me with detailed information about Alberto SALGADO's vehicles, addresses, and any available phone numbers. I was able to independently corroborate much of the information provided to me by the CS through surveillance, phone tolls analysis, and law enforcement and commercial databases, some of which is described in this affidavit.

**B.    Controlled Purchase of 86 Grams of Counterfeit Oxycodone Pills from SALGADO on October 21, 2019**

11. Prior to October 21, 2019, law enforcement officers monitored and recorded the CS engaging in narcotics related calls with SALGADO during which the CS told SALGADO that a buyer would travel to Sacramento on October 21, 2019. On October 20, 2019, SALGADO contacted the CS and confirmed he would be able to supply the CS with approximately 750 counterfeit oxycodone pills on October 21, 2019.

12. On October 21, 2019, SALGADO contacted the CS confirming he acquired the pills from his source and would be able to meet the CS later that day. The CS informed SALGADO that the CS's buyer (i.e., DEA SA Brian Nehring in an undercover capacity) would be travelling from Vallejo to meet with the CS. Utilizing court-authorized phone location data pings for Alberto SALGADO's cell phone (2:19-SW-0876 DB), agents established surveillance on SALGADO's suspected stash house at 8471 Varney Ave, Sacramento, CA as the GPS location data showed that SALGADO was in the vicinity of the residence.  At approximately 1:00 p.m., the CS contacted SALGADO and informed him that the CS would be at the same meet location as the previous two controlled purchases (8126 Sheldon Road, Elk Grove, CA), to which SALGADO replied he would be there in approximately 20 minutes.

///

AFFIDAVIT       4

13. Officers then searched the CS for contraband with negative results, outfitted the CS with a recorder and transmitter, and SA Nehring and the CS travelled in SA Nehring's vehicle to the meet location. Around this same time, agents observed SALGADO walk away from his suspected stash house and travel to the meet location.

14. SA Nehring and the CS arrived at the meet location at approximately 1:20 p.m. and then agents observed SALGADO arrive shortly thereafter. SA Nehring then gave the CS $6,380; the CS then exited SA Nehring's vehicle and entered the front passenger seat of SALGADO's vehicle. At this time, SALGADO gave the CS approximately 750 (86 grams) counterfeit oxycodone pills with the markings "M" on one side and "30" on the opposite side of each pill. The pills were contained within a plastic bag which was further contained within a brown paper bag.

15. Shortly after the exchange, the CS exited SALGADO's vehicle and entered SA Nehring's vehicle. Immediately upon entering SA Nehring's vehicle, the CS turned the pills over to SA Nehring. The pills were subsequently transferred to the DEA Laboratory, where a single pill was analyzed and tested positive for fentanyl. The pills appeared identical to the sample pills that SALGADO gave to the CS on September 5, 2019.

16. Shortly after the CS exited SALGADO's vehicle, SALGADO departed the meet location and travelled back to his suspected stash house.

C. **Controlled Purchases of a Total of 1,100 (119 Grams Total) Counterfeit Oxycodone Pills from SALGADO on June 3, 2020**

17. Prior to June 3, 2020, Alberto SALGADO approached the CS at the CS's residence. SALGADO told the CS that he was selling heroin and fentanyl pills and wanted the CS to have his new phone number in case the CS knew people who were interested. Agents also monitored and recorded the CS engaging in narcotics related phone calls with SALGADO. During these calls, the CS told SALGADO that the CS was in conversation with the same buyer who purchased the heroin and pills during the three aforementioned deals (i.e., SA Nehring). The CS told SALGADO that the buyer was interested in buying several hundred pills, to which SALGADO stated he would sell the pills for $9.00 per pill.

///

AFFIDAVIT 5

18. On June 3, the CS confirmed with SALGADO that the buyer would be purchasing at least 600 pills and would be at the regular meet location around 12 p.m.

19. Later that day, I reviewed the court-authorized GPS location data for SALGADO's new phone (2:20-SW-0460-DB) and saw that SALGADO was located at his suspected stash house. Agents set up surveillance at the residence. At around the same time, officers searched the CS for contraband with negative results, outfitted the CS with a recorder and transmitter, and SA Nehring and the CS travelled in SA Nehring's vehicle to the same meet location as the previous deals. As the CS and SA Nehring arrived, the CS sent SALGADO a text message "Am going to parking lot bro he is there at winco he said bye doll or tree p." SALGADO responded "20 min."

20. A short time later, I observed, via a pole camera, SALGADO and a dark skinned male walk away from the stash house and get into SALGADO's vehicle. Agents observed SALGADO arrive at the meet location, at which time he called the CS. SALGADO stated he saw an individual parked in a vehicle at the meet location which he believed was a police officer. SALGADO then drove to the southeast exit of the parking lot that empties into a residential area and told the CS where he was in order to meet. SA Nehring and the CS travelled to the new meet location, and SA Nehring gave the CS $5,400. The CS exited SA Nehring's vehicle and met with SALGADO and the unknown male in SALGADO's vehicle. At this time, SALGADO gave the CS approximately 600 pills (65 Grams) in exchange for the $5,400. During this meeting, the CS told SALGADO that the buyer had money for an additional 500 pills and asked if SALGADO could supply the CS with this amount. SALGADO told the CS he would have to travel to meet his Source of Supply ("SOS") and give the SOS the money and get more pills.

21. After the meeting, the CS immediately turned over the pills to SA Nehring upon entering SA Nehring's vehicle and was searched for contraband with negative results. The pills were subsequently sent to the DEA Laboratory, where a single pill was analyzed and tested positive for fentanyl. The pills appeared identical to the 750 pills purchased on October 21, 2019 and the sample pills SALGADO gave to the CS on September 5, 2019.

22. SALGADO travelled back to his suspected stash house. SALGADO contacted the CS during which he informed the CS he spoke with the SOS and was heading down to pick up the 500 pills.

1 Agents observed SALGADO travel alone to CERVANTES' residence. SALGADO walked up to the
2 gate, opened the gate and walked towards the front door area of the residence, out of sight. SALGADO
3 was in the residence for just a few minutes before agents observed him walk away from the residence
4 and get back in his vehicle.

5     23. Agents observed SALGADO leave CERVANTES' residence and travel to his primary
6 residence, 9017 Willowberry Way, Elk Grove, CA. Agents then searched the CS for contraband with
7 negative results and then SA Nehring and the CS travelled to the same residential area where the first
8 deal took place. Shortly after arriving, agents observed SALGADO leave his residence and travel to the
9 residential meeting area. SA Nehring then gave the CS the $4,600, and the CS exited SA Nehring's
10 vehicle and entered SALGADO's vehicle, where SALGADO gave the CS the pills (54 Grams) in
11 exchange for the $4,600. The CS exited SALGADO's vehicle and immediately turned over the pills to
12 SA Nehring. These pills were subsequently sent to the DEA Laboratory, where a single pill was
13 analyzed and tested positive for fentanyl. The pills appeared identical to the 600 pills purchased earlier
14 that day, the 750 pills purchased on October 21, 2019, and the two sample pills SALGADO gave to the
15 CS on September 5, 2019.

16     **D.**     **Purchase of 104 Gross Grams of Counterfeit Oxycodone Pills Suspected to Contain**
17           **Fentanyl from SALGADO on September 17, 2020**

18     24. Prior to September 17, 2020, agents monitored and recorded the CS engaging in narcotics
19 related phone calls with SALGADO. During these calls, the CS told SALGADO that the CS was in
20 conversation with the same buyer who purchased the pills during the previous drug deals (i.e., SA
21 Nehring). The CS told SALGADO that the buyer was interested in buying several hundred pills, to
22 which SALGADO stated he would sell the pills for $9.00 per pill.

23     25. On the morning of September 17, 2020, agents established surveillance on SALGADO's
24 primary residence. Agents observed SALGADO travel to his suspected stash house. After SALGADO's
25 arrival at the residence, agents directed the CS to telephonically contact SALGADO to further plan the
26 drug transaction. The CS informed SALGADO that the buyer had $5,000 to spend and SALGADO
27 agreed to a price of $9.00 per pill which allowed the buyer to purchase 555 pills; the CS also requested 5
28 additional pills that SALGADO had not given to the CS on the previous deal which occurred on June 3,

1  2020. In total, SALGADO agreed to give the CS 560 pills. Approximately 50 minutes later, the CS
2  placed another recorded call to SALGADO. The CS told SALGADO that the CS and buyer would be
3  traveling to the meet location, the Dollar Tree parking lot located at 8126 Sheldon Rd, Elk Grove, CA,
4  shortly. SALGADO replied that he was going to finish watering his plants, indicating he would be
5  traveling to the meet location soon as well. From my training and experience, I believe SALGADO did
6  not yet have the pills, as often times drug dealers will lie to customers about their whereabouts, current
7  activities, etc. in order to stall meeting with the customer before they can obtain the drugs themselves.

8        26.     Agents then searched the CS for contraband with negative results, outfitted the CS with a
9  recorder and transmitter, and SA Nehring and the CS travelled in SA Nehring's vehicle to the meet
10 location. Approximately 15 minutes after the prior CS call to SALGADO was completed, agents
11 observed SALGADO's suspected SOS, CERVANTES, arrive at SALGADO's suspected stash house in
12 his vehicle and saw CERVANTES enter the residence, out of sight. Shortly thereafter, agents saw
13 SALGADO leave the suspected stash house in his vehicle and travel to the meet location.

14       27.     At the meet location, SA Nehring gave the CS $5,000 and the CS exited SA Nehring's
15 vehicle and met with SALGADO in SALGADO's vehicle. At this time, SALGADO gave the CS
16 approximately 560 pills (104 Gross Grams) in exchange for the $5,000.

17       28.     After the CS conducted the drug purchase, the CS immediately turned over the pills to
18 SA Nehring upon entering SA Nehring's vehicle and was searched for contraband with negative results.
19 The pills were subsequently sent to the DEA Laboratory for analysis; test results are pending. The pills
20 appear identical to the counterfeit oxycodone pills which had been previously purchased from
21 SALGADO on October 21, 2019 and June 3, 2020, which tested positive for containing fentanyl.
22 Accordingly, based on my training, experience and prior controlled purchases from SALGADO, I
23 believe the pills likely are counterfeit oxycodone pills containing fentanyl.

24       29.     After the CS exited SALGADO's vehicle, agents followed SALGADO back to his
25 suspected stash house, where CERVANTES remained during the pill deal. Shortly after SALGADO
26 arrived back at the suspected stash house, SA Jason Chin monitored the pole camera and observed
27 SALGADO and CERVANTES in front of the residence having a conversation. After a few minutes,
28 CERVANTES entered his vehicle and drove away. From my training and experience, I understand that

AFFIDAVIT                                                     8

it is common for a SOS to give drugs to a dealer without receiving money up front for the exchange, then allowing the dealer to meet with a customer while waiting for the dealer to return to the SOS with money to pay for the original transaction. Accordingly, I believe CERVANTES is SALGADO's pill SOS.

### E. Phone Toll Analysis of SALGADO's Phone Activity on September 17, 2020

30. Toll records for SALGADO's phone show that on September 17, 2020, the date of the controlled purchase described above, the CS contacted SALGADO confirming that the buyer had $5,000 to spend on pills at 10:47 a.m. After this drug-related conversation, SALGADO only contacted the Target Cell Phone, which occurred at 10:55 a.m. Following this contact with the Target Cell Phone, SALGADO did not contact any other phone number until at approximately 11:39 a.m. when the CS contacted SALGADO informing him that he/she was with the buyer and they were traveling to the meet location. A review of SALGADO's toll records revealed that after SALGADO finished this drug-related phone call with the CS, SALGADO contacted the Target Cell Phone a total of four times between 11:40 a.m. and 11:41 a.m. SALGADO did not telephonically contact any other telephones until the CS and SALGADO made contact later that day.

31. Additionally, at approximately 12:04 p.m., about twenty minutes after SALGADO completed the final telephonic contact with the Target Cell Phone, agents observed CERVANTES arrive at SALGADO's suspected stash house. From my training and experience, I know that drug traffickers often times will contact their SOS immediately after speaking to potential customers in order to obtain drugs. Since SALGADO made contact with the Target Cell Phone a total of five times after both drug-related conversations he had with the CS, and since CERVANTES arrived shortly after SALGADO's final telephonic contact with the Target Cell Phone, it is suspected that SALGADO was attempting to contact the Target Cell Phone to obtain drugs and subsequently met with CERVANTES.

32. Law enforcement inquiries with Sprint revealed that since July 20, 2018 through September 28, 2020 (date of last inquiry) the Target Cell Phone had a single name subscriber of "ALEJANDRO" with no last name or address on the subscriber report. It is a common practice among drug traffickers to put minimal personal information on telephone subscriber accounts in an effort to evade detection by law enforcement.

33. I reviewed phone toll records for the Target Cell Phone from September 30, 2019 through October 21, 2019, the date of the controlled purchase of 86 grams of counterfeit prescription pills containing fentanyl from SALGADO. Leading up to this purchase, the CS had a telephonic contact with SALGADO on October 20, 2019, at approximately 5:24 p.m. during which SALGADO told the CS he was attempting to get in touch with his SOS to meet and pick up the pills, but the SOS was out of town and SALGADO was unsure if the meeting would happen. A review of the tolls shows that prior to this drug-related call with the CS, SALGADO had attempted to make 5 telephonic contacts and sent one text message to the Target Cell Phone between 4:40 p.m. and 5:03 p.m. Following the call with the CS, SALGADO had two telephonic contacts with the Target Cell Phone at approximately 6:01 p.m. and 6:02 p.m. After these contacts with the Target Cell Phone, SALGADO called the CS at approximately 7:30 p.m. and told the CS that his SOS could obtain the pills and hand them off to SALGADO. A review of the tolls revealed that SALGADO did not have contact with any other phones between the telephonic contacts with the Target Cell Phone at 6:02 p.m. and the CS contact at 7:30 p.m. From my training and experience, I know that drug dealers often have phone contacts with their customers and SOS that can be seen in patterns. Being that on multiple occasions, I have reviewed tolls and observed that each time the CS has contacted SALGADO regarding the purchase of pills, SALGADO has developed a pattern of contacting the Target Cell Phone as well, and thus I believe the Target Cell Phone is being used by CERVANTES, SALGADO's SOS.

34. It should be noted that the Target Cell Phone was not in contact with any of SALGADO's known phones on the day of the June 3, 2020, controlled purchase of counterfeit oxycodone pills containing fentanyl, for which CERVANTES is the suspected SOS based on surveillance observations coupled with SALGADO's statements to the CS.

35. Based on my training, experience, and knowledge of the particular facts of this case, I believe that the Target Cell Phone is likely being used by SALGADO's drug SOS, CERVANTES, in furtherance of his drug trafficking activities. I further believe that receiving precise location information from the Target Cell Phone will assist investigators in determining the identification, physical location and criminal activities of SALGADO's drug SOS, CERVANTES, as well as in identifying the location of any drug stash house locations used by CERVANTES.

36. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

37. Based on my training and experience, I know that Sprint can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Verizon's network or with such other reference points as may be reasonably available.

38. Based on my training and experience, I know that Sprint can collect cell-site data about the Target Cell Phone.

### III.     AUTHORIZATION REQUEST

39. Based on the foregoing, I request that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

40. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would

seriously jeopardize the ongoing investigation, as such a disclosure would give them an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

41.     I further request that the Court direct Sprint to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Sprint.  I also request that the Court direct Sprint to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Target Cell Phone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

**[CONTINUED ON NEXT PAGE]**

42.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ James Bonanno (signed electronically)

James Bonanno
Special Agent
Drug Enforcement Administration

Subscribed and sworn to me telephonically on: 10/05/2020

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

/S/DAVID W. SPENCER
Approved as to form by AUSA DAVID SPENCER

In addition, to ensure technical compliance with 18 U.S.C. §§ 3121-3127, I also request that this warrant shall also function as a pen register order. I thus certify that the information, under oath, that likely to be obtained is relevant to an ongoing criminal investigation conducted by the DEA, based on the agent's affidavit herein. *See* 18 U.S.C. §§ 3122(b), 3123(b).

AFFIDAVIT                                    13

## **ATTACHMENT A**

### **Property to Be Searched**

1. The cellular telephone assigned number (209) 361-1453 (the "Target Cell Phone"), whose service provider is Sprint, a wireless telephone service provider headquartered at 6360 Sprint Parkway, Overland Park, Kansas.

Information about the location of this phone that is within the possession, custody, or control of Sprint.

## ATTACHMENT B

## Particular Things to be Seized

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the Target Cell Phones on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

# UNITED STATES DISTRICT COURT
for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of ) <br> ) <br> THE CELLULAR TELEPHONE ASSIGNED CALL ) <br> NUMBER (209) 361-1453 ) <br> ) <br> ) | Case No.   2:20-sw-0904 DB <br><br> **SEALED** |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____New Jersey_____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A), and 2711(3)(A). Because the government has satisfied the requirements of 18 U.S.C. § 3122, this warrant also constitutes an order under 18 U.S.C. § 3123.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before     October 19, 2020     *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern District of California.

☒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☒ for   30   days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     10/05/2020 4:39 p.m.

City and state:     Sacramento, California

*(signature)*
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** |||
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : |||
| Inventory of the property taken and name of any person(s) seized: |||

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____      _____
                    Signature of Judge                                           Date

## **ATTACHMENT A**

### **Property to Be Searched**

1. The cellular telephone assigned number (209) 361-1453 (the "Target Cell Phone"), whose service provider is Sprint, a wireless telephone service provider headquartered at 6360 Sprint Parkway, Overland Park, Kansas.

Information about the location of this phone that is within the possession, custody, or control of Sprint.

## ATTACHMENT B

## Particular Things to be Seized

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon's services, including by initiating a signal to determine the location of the Target Cell Phones on Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).